**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

JMF MEDICAL, LLC, )
FREEMAN MD, LLC, )
NICKLES & ASHLYN )
BERGERON, LLC, )
JOSEPH THOMAS JR. MD, LLC, )
ASHLYN KIDD BERGERON, )
NATHAN PAUL FREEMAN, )
JARED MICHAEL FABRE, )
LEO DAVID VERLANDER, JR., )
JOSEPH THOMAS, JR., )
NICKLES PAUL BERGERON, )
 )
  Plaintiffs, )
 )
v. ) CIVIL ACTION NO.:
 )
TEAM HEALTH, LLC, F/K/A )
TEAM HEALTH, INC.; ACS )
PRIMARY CARE PHYSICIANS )
LOUISIANA; TEAM HEALTH )
HOLDINGS, INC.; AMERITEAM )
SERVICES, LLC, HCFS )
HEALTHCARE FINANCIAL )
SERVICES, LLC, )
 )
  Defendants. )

## CLASS ACTION COMPLAINT

  COME NOW, Plaintiffs, JMF Medical, LLC, Freeman MD, LLC, Nickles &

Ashlyn Bergeron, LLC, Joseph Thomas Jr. MD LLC Ashlyn Kidd Bergeron, Nathan

Paul Freeman, Jared Michael Fabre, Leo David Verlander, Jr., Joseph Thomas, Jr., and Nickles Paul Bergeron, on behalf of themselves and others similarly situated and bring this civil action to recover damages against the above-named Defendants, and for their causes of action would show unto the Court, the following:

## NATURE OF THE ACTION

1.      Plaintiffs are a group of emergency room physicians and their entities who file this Class Action lawsuit on behalf of themselves and all other similarly situated emergency room physicians in the state of Louisiana who worked for the Team Health Organization, due to Defendants' routine and systematic failure to pay physicians for the services Plaintiffs provide to their patients.

2.      In particular, all named Defendants, through the Team Health Organization[1], do not pay Plaintiffs and other Louisiana physicians for "Relative Value Units" (hereinafter "RVUs") earned when patients are treated by nurse

---

[1] The term "Team Health" and the "Team Health Organization" encompass the collective identity of the Defendants named in this lawsuit, and also create the RICO enterprise.  See Press Release on www.teamhealth.com dated 6/4/2019 ("The term "TeamHealth" as used throughout this release includes TeamHealth Holdings, Inc., its subsidiaries, affiliates, affiliated medical groups and providers, all of which are part of the TeamHealth organization. "Providers" are physicians, advanced practice clinicians and other healthcare providers who are employed by or contract with subsidiaries or affiliated entities of TeamHealth Holdings, Inc.") last accessed 6/12/2019; *See Also* the Corporate Integrity Agreement Signed by Team Health and listed on the Department of Health and Human Services website at https://oig.hhs.gov/fraud/cia/agreements/Team_Health_Hodlings_Inc_and_IPC_Healthcare_Inc_02032017.pdf ("Team Health Holdings, Inc. and its subsidiaries or affiliates… (collectively "TeamHealth"),

2

practitioners and/or physician assistants (hereinafter "advance practice clinicians" or "APCs") under the physician's direction (hereinafter "Assisting RVUs").

3.    By failing to pay these Assisting RVUs to the physicians, Defendants are in breach of their contracts with Plaintiffs, have perpetrated wire and mail fraud in furtherance of a racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO Statute"), and have been unjustly enriched at the expense of Plaintiffs.

## PARTIES, JURISDICTION, AND VENUE

4.    Plaintiff JMF Medical, LLC, is a Louisiana limited liability company, with one member (Plaintiff Dr. Jared Fabre), with its principal place of business in Louisiana and is thus domiciled in Louisiana.

5.    Plaintiff Freeman MD LLC, is a Louisiana limited liability company, with one member (Plaintiff Dr. Nathan Paul Freeman), with its principal place of business in Louisiana and is thus domiciled in Louisiana.

6.    Plaintiff Nickles & Ashlyn Bergeron, LLC, is a Louisiana limited liability company, with two members (Plaintiffs Drs. Nickles and Ashlyn Bergeron), with its principal place of business in Louisiana and is thus domiciled in Louisiana.

7.     Plaintiff Joseph Thomas Jr. MD, LLC, is a Louisiana limited liability company, with one member (Plaintiff Dr. Joseph Thomas Jr.), with its principal place of business in Louisiana and is thus domiciled in Louisiana.

8.     Plaintiff Dr. Ashlyn Kidd Bergeron is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

9.     Plaintiff Dr. Nathan Paul Freeman is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

10.     Plaintiff Dr. Jared Michael Fabre is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

11.     Plaintiff Dr. Leo David Verlander, Jr. is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

12.     Plaintiff Dr. Joseph Thomas, Jr. is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

13.     Plaintiff Dr. Nickles Paul Bergeron is an individual physician over the age of eighteen (18) years and is domiciled in Louisiana.

14.     Defendant Team Health, LLC , f/k/a Team Health, Inc., is a Tennessee limited liability company, with one member (Team Health Holdings, Inc. a domicile

of Delaware and Tennessee), with its principal place of business in Knoxville, Tennessee and is thus domiciled in Tennessee and Delaware.

15.    Team Health, LLC did and does business in the State of Louisiana at all times material herein and acts as the agent of Defendant Team Health Holdings, Inc.

16.    Team Health, LLC is a separate legal entity but operates under the Team Health Organization's dominion and control, and at the Organization's direction, to perpetuate and form the scheme and enterprise explained further below.

17.    Team Health, LLC acts as the agent of the Team Health Organization

18.    Defendant Team Health Holdings, Inc. is a Delaware corporation with its principal place of business in Knoxville, Tennessee and thus has domicile in Delaware and Tennessee.  Team Health Holdings, Inc. did and does business in the State of Louisiana at all times material herein.

19.    Defendant Team Health Holdings, Inc. is the parent company of all the other named Defendants in this lawsuit.

20.    Defendant AmeriTeam Services, LLC (hereinafter "AmeriTeam") is a Tennessee limited liability company with one member ("Team Finance, LLC", a Delaware limited liability company with its principal place of business in Tennessee,

5

whose sole member is Team Health Holdings, Inc.), with its principal place of business in Knoxville, Tennessee and is thus domiciled in Tennessee and Delaware.

21.    AmeriTeam did and does business in the State of Louisiana at all times material herein.

22.    AmeriTeam is a separate legal entity but operates under the Team Health Organization's dominion and control, and at the Organization's direction, to perpetuate and form the scheme and enterprise explained further below.

23.    AmeriTeam acts as the agent of the Team Health Organization.

24.    Defendant HCFS Healthcare Financial Services, LLC (hereinafter "HCFS") is a Florida limited liability company with seven members domiciled in Tennessee, with its principal place of business in Knoxville, Tennessee; thus HCFS is domiciled in Tennessee and Florida.   HCFS did and does business in the State of Louisiana at all times material herein.  HCFS is a separate legal entity but operates under the Team Health Organization's dominion and control, and at the Organization's direction, to perpetuate and form the scheme and enterprise explained further below.

25.     HCFS acts as the agent of the Team Health Organization[2].

26.     Defendant ACS Primary Care Physicians-Louisiana (hereinafter "ACS"), is a Louisiana professional corporation with its principal mailing address, domicile, and principal office address at 501 Louisiana Avenue, Baton Rouge, LA. ACS did and does business in the State of Louisiana at all times material herein. ACS is a separate legal entity but operates under the Team Health Organization's dominion and control, and at the Organization's direction, to perpetuate and form the scheme and enterprise explained further below.

27.     ACS acts as the agent of the Team Health Organization.

28.     All of the named Defendants do business as "Team Health" or the "Team Health Organization".

29.     All of the named Defendants use the same internal databases for files.

30.     All of the named Defendants use the same e-mail server.

31.     All of the named Defendants act in concert to form the criminal enterprise knowns as "Team Health" or the "Team Health Organization.

---

[2] Per the HCFS website emblazoned with the TeamHealth logo at the top, "HCFS of TeamHealth provides reliable, full-service management of your entire revenue cycle".  http://hcfsofth.wpengine.com/our-services/ last accessed 6/11/2019.

32.    Alternatively, all of the named Defendants do business via apparent and/or actual authority on behalf of Defendant Team Health Holdings, Inc.

33.    Alternatively, all named Defendants except Defendant Team Health Holdings, Inc. are mere instrumentalities of Defendant Team Health Holdings, Inc.

34.    All named Defendants except Defendant Team Health Holdings, Inc. are organized and used by the parent Defendant Team Health Holdings, Inc. to breach the contracts with the Plaintiffs.

35.    All of the named Defendants except Defendant Team Health Holdings, Inc. are undercapitalized and do not have authority to enter into and administer the contracts that they do, and solely do so at the behest of the parent Defendant Team Health Holdings, Inc.

36.    Specifically, the contracts with Plaintiffs are often entered into by non-operating subsidiaries on behalf of Team Health Holdings, Inc.

37.    The corporate veil of Defendant Team Health Holdings, Inc. should thus be pierced due to the sham operations of its subsidiaries, which fail to maintain separate identities (all operating as "Team Health"), were undercapitalized, shared the same corporate officers, did not update their bylaws, did not hold annual

meetings, and lacked the requisite corporate formalities necessary to function as separate companies.

38. This Court has jurisdiction over the class claims in this case pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d), which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the Plaintiff Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

39. This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

40. Plaintiff and all members of the Class allege that the total claims of the individual members of the proposed Plaintiff Class are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5). As set forth below, Plaintiffs are domiciled in Louisiana and are citizens of Louisiana, and Defendants are domiciled and considered citizens of Louisiana, Tennessee, Delaware, and Florida. Therefore, minimal diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

41.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this Class Action Complaint occurred in this district.

42.     Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS AND SCHEME

### Background

43.     Team Health is a national multi-billion dollar staffing company. Team Health, through its subsidiaries, has contracted with approximately 3,900 independent contractor physicians (including Plaintiffs) in as many as 47 states to handle emergency care at approximately 3,300 hospitals across the country (collectively referred to as "Team Health Facilities" or "TH Facilities"). Because Defendants signed exclusive contracts with the TH Facilities, emergency care physicians cannot contract with the TH Facilities directly. The physicians must contract with Defendants in order to work in the emergency rooms of the TH Facilities. In addition to physicians, Team Health contracts with physician assistants and nurse practitioners (collectively referred to as "Advance Practice Clinicians" or "APCs") to treat patients under a physician's direction.

44.    Under Defendants' contracts with the TH Facilities and Plaintiffs, referred to as Medical Professional Independent Contractor Agreements, Defendants make money based on the number of patients each physician is responsible for during his/her shift, and the services provided to each patient. Defendants make less money on a physician if he/she is unproductive on duty. Conversely, Defendants make more money on a physician if he/she is industrious and takes on responsibility for more patients.

45.    TH Facilities include, among many others: Ochsner Medical Center in Baton Rouge, Rapides Regional Medical Center, and Slidell Memorial Hospital.

46.    TH provides emergency medical services through administrative offices located at several regional sites.

### The RVU Bonus Program

47.    At least as early as 2012, Defendants sought to add a bonus program to the contracts of the physicians at TH Facilities in order to incentivize the physicians to take on responsibility for more patients during each shift, so Defendants could bill more and make more money. This program was motivated by the need to attract and retain the best possible physicians to the TH Facilities and their markets, and was presented to the physicians as a way for them to make more money as well.

48.    Defendants' bonus system relies on "relative value units" ("RVUs") to determine the amount of each physician's bonus. RVUs assign a value to each service provided and the resources used to provide that service.

49.    RVUs are generated when physicians see the patients directly and when they supervise nurse practitioners and physician assistants (hereinafter "Mid Level Providers" and "MLPs" as well as "Advanced Practice Clinicians" and "APCs" – for the purposes of this Complaint, the titles are used interchangeably) who treat patients under the physician's direction.

50.    RVUs generated through Plaintiffs' supervision of APCs/MLPs without seeing the patient directly are commonly referred to as "Assisting RVUs" or "Supervisory RVUs" or "Shared RVUSs" by Defendants[3].

51.    Receiving bonus credit for the Assisting/Supervisory/Shared RVUs is critically important to the physicians at the TH Facilities.

## The Importance of Assisting RVUs

---

[3] For the sake of brevity in this Complaint, Plaintiffs' will refer to the "Supervisory" or "Shared" RVUs as "Assisting RVUs".

52.     The importance of physician credit for Assisting RVUs is easiest understood in the context of patient charts and the liability risk that physicians assume in signing those charts.

53.     A physician is responsible for every patient whose chart he/she signs, whether he/she sees the patient directly or simply supervises an APC's treatment plan.

54.     At TH facilities, every patient chart requires a physician to sign his/her name, attesting to the fact that he/she is taking personal responsibility for the patient's treatment.

55.     These physician signatures also allow Defendants to increase their billing and collections with various insurers and lower Defendants' exposure to liability.

56.     If a physician sees a patient directly, Team Health used an attestation such as the following in the patient's chart:

> I personally evaluated and examined the patient in conjunction with the MLP ("Mid-Level Provider") and agree with the assessment and treatment plan and disposition of the patient as recorded by the MLP (an MLP is the same thing as an APC).

57.    When an APC sees a patient under the physician's direction, the physician is responsible for the patient's diagnosis and treatment, and either works with the APC to formulate a treatment plan, or, if the APC has already created a treatment plan, reviews and makes changes to the plan to ensure that it is appropriate. In this situation, Team Health uses a different default attestation in the patient's chart. The following is a sample of language used by Team Health in such circumstances:

> I was personally available for consultation in the emergency department. I have reviewed the chart and agree with the documentation as recorded by the MLP, including the assessment, treatment plan and disposition.

58.    A physician signs an attestation on every patient chart, including charts where he/she assisted the APC but did not see the patient directly.

59.    Regardless of whether or not a patient is directly seen by a physician, the patient's chart and attestations therein, as well as the contracts discussed below, all recognize that a physician takes on considerable responsibility for every patient's diagnosis, treatment, and disposition, and that he/she spends significant time assisting patients by consulting with APCs and reviewing patient charts.

60.     Physicians can be held liable for the treatment provided to a patient, regardless of whether the physician saw the patient directly or supervised the APC's treatment plan.

61.     In fact, multiple physicians have been sued even though they did not see the patient personally because they supervised an APC and signed off on patient charts.

62.     For that reason, when Defendants recruited Plaintiffs to participate in the RVU bonus program, Plaintiffs were assured that, along with the liability they was assuming, they would receive credit for RVUs generated through the supervision of APCs.

63.     Although Defendants represented to Plaintiffs that Plaintiffs would be paid bonus credit for RVUs earned by assisting and supervising APCs, they have failed and refused to pay Plaintiffs accordingly.

64.     When Defendants promised to include the Assisting RVUs as part of Plaintiff's total RVUs for bonus purposes, Defendants admittedly had a policy to not include RVUs in Plaintiff's total RVUs.

65.     In *Dixie Emergency Physicians, LLC, et al., v. Team Health, Inc., et al*. No. 7:16-cv-01622-LSC (N.D.AL), other physicians sued some of the same

Defendants, who admitted breaching substantially similar contracts using substantially similar language. (See Case No. 7:16cv-01622-LSC, Doc. 50 at ¶ 20 & ¶¶ 45-49 (Plaintiff's Second Amended Complaint) and Doc. 55 at ¶¶ 45-49 (Defendant's Answer).

66.    This systematic, uniform, and routine refusal to pay physicians for Assisting RVUs, or RVUs generated while supervising APCs, is the "Scheme" perpetrated by the Defendants through the Team Health Organization.

67.    Each time the Team Health Organization failed to provide payment to the Plaintiffs for the medical services they provided that involved the supervision of APCs, the Team Health Organization committed a predicate act of wire and mail fraud in furtherance of the RICO conspiracy.

**The Contracts**

68.    Defendants were required to give Plaintiffs RVU bonus credit for RVUs generated by supervising APCs, under the terms of the contracts.

69.    The contracts Plaintiffs entered with Defendants provided RVU credit for supervision of APCs. According to the "Ochsner Medical Center" section of Plaintiffs' contract, Plaintiffs are to be paid in the following manner:

16

At the end of each calendar month (the "Month") during the term of this Agreement, Company shall, with respect to the Emergency Department at Ochsner Medical Center, determine, in its sole discretion and in accordance with its accounting procedures:

(i) the percentage of hours Physician worked during that Month when compared to total hours worked by physicians eligible to participate in the Plan (the "Eligible Physicians") during that Month ("Physician's Plan Hours Percentage");

(ii) the total relative value units ("Total RVUs") generated by Physician during that Month;

(iii) the Total RVUs generated by nurse practitioners and physician assistants during that Month whose patient charts have been appropriately documented and signed off on by an Eligible Physician ("MLP Total RVUs");

(iv) Physician's portion of MLP Total RVUs for that Month ("Physician's MLP RVUs") by multiplying the MLP Total RVUs for that Month by Physician's Plan Hours Percentage; and,

(v) Physician's Total RVUs for that Month ("Physician's Total RVUs") as the sum of the Total RVUs generated by Physician during that Month and Physician's MLP RVUs.

NOTE: For purposes of this Agreement, relative value units ("RVUs") shall be defined as set forth in 42 C.F.R. Section 414.22.

70.    Other Louisiana Team Health Facilities have similar RVU Plan language.

71.     Under Plaintiffs' contracts, Defendants have no discretion in how they count or credit the RVUs.

72.     Defendants cannot refuse to count the Assisting RVUs or fail to credit them toward Plaintiffs' total RVUs.

73.     Yet they do in furtherance of the Scheme to defraud the Plaintiffs and the putative class of rightfully owed payments.

74.     In short, the Defendants were required to count all the RVUs attributable to the providers (including but not limited to those "attributable to nurse practitioners and/or physicians assistants while providing their services under Professional's direction") such as the Plaintiffs, and multiply that total by the "multiplier".

75.     By intentionally failing to include the RVUs generated by supervising APCs in that equation, the Team Health Organization is in breach of the contract with Plaintiffs.

76.     Additionally, the Team Health Organization furthered the scheme to defraud the Plaintiffs and the putative class of rightfully owed payments by continuing to systematically deny payments to the Plaintiffs for RVUs generated by supervising APCs.

**<u>Defendants' Breach</u>**

77.    Plaintiffs, individually and on behalf of the Class, believed that the data on their weekly paychecks and paystubs reflected bonus credit for the RVUs generated through every chart they signed.

78.    However, Defendants were secretly subtracting out the Assisting RVUs from the bonus credit on each paycheck, but failing to disclose this fact or provide Plaintiffs with sufficient data to ascertain the truth.

79.    The Defendants themselves have now admitted they do not provide bonus credit for Assisting RVUs.

80.    Defendants represented to Plaintiffs that they would receive bonus compensation for all RVUs generated through the services they provided and that the services they provided included supervision of APCs.

81.    Plaintiffs relied on these representations in joining and remaining as a Team Health provider.

82.    Because the contracts promised to compensate Plaintiffs with a bonus for their supervision of APCs, Plaintiffs believed the numbers and amounts on their paychecks accurately represented full compensation for all RVUs generated, including those based upon supervision of APCs.

83. In actuality, the RVUs generated by supervising APCs were being subtracted systematically from Plaintiffs' bonus calculations as part of the Defendants' Scheme.

84. Because the underlying data was hidden from Plaintiffs, they were unable to discern what Defendants were doing.

85. However, Defendants recently admitted that it is their policy not to pay Team Health physicians for RVUs generated by supervising APCs in the Southeast region.

86. Despite admitting that they are not paying for these RVUs, Defendants have persisted in their scheme to defraud Plaintiffs and have not paid back the bonus money taken or corrected the problem moving forward.

87. In sum, all Team Health doctors in the state of Louisiana were promised to be paid for RVUs generated by supervising APCs, which is apparent from the uniform parts of all their contracts.

88. The Team Health Organization, through its various agents such as ACS, Team Health LLC, HCFS, and AmeriTeam (among others – the complete list of contracting Louisiana subsidiaries is unknown at this time), contracted with the

doctors in the putative class, are now in breach of those contracts, and in bad faith breach of those contracts.

89.    All of the named Defendants acted in concert with one another throughout the United States to violate the RICO statute through a pattern of racketeering activity for personal, financial gain, to fraudulently convey false and misleading information concerning the payments to healthcare providers at Team Health facilities.

90.    The pattern of racketeering was perpetrated by all Defendants. These concerted efforts resulted in significant financial harm to the doctors employed at Team Health facilities, including the Plaintiffs and the putative class. But for the actions and inactions of Defendants, individually, jointly, and in concert with one another, Plaintiffs would have been paid for all services provided and performed at the Team Health facilities, including Assisting RVUs. Defendants' actions and inactions make them each individually liable and responsible for Plaintiffs' injuries and damages as described herein.

91.    Specifically, Team Health LLC and ACS created and signed the underlying contract with Plaintiffs.

92.    AmeriTeam managed the contracts with Plaintiffs.

93.     ACS subcontracted billing functions to HCFS who in turn billed for Plaintiffs' Assisting RVUs.

94.     Team Health Holdings, Inc. ultimately directed the activities of all its agents and subsidiaries, including the decision to not pay Plaintiffs and the putative class for RVUs they generated by supervising APCs.

95.     Team Health Holdings, Inc. directed the activities of the subsidiary Defendants via apparent, actual, explicit, and/or implied authority.

96.     Together, all the named Defendants acted in concert to perpetrate these violations against Plaintiffs and the putative class through the enterprise known as TeamHealth or the Team Health Organization.

97.     Alternatively, Plaintiffs allege that the corporate veil of Team Health Holdings, Inc. should be pierced as the structure of the Team Health Organization is merely a façade for one large organization that exercises exclusive control over all Team Health physicians' contracts.

98.     Team Health Holdings, Inc. fails to observe corporate formalities in that its officers and shareholders hold the same role in its subsidiaries, all subsidiaries are on the same email system, all use the same letterhead, have the same principal

place of business and office space, and use the same logo when communicating internally and with outside parties (for instance, on their websites).

99.    Team Health Holdings, Inc. fails to sufficiently capitalize its subsidiaries and siphons funds from operating subsidiaries without formal intercompany agreements.

100.    Team Health Holdings, Inc. has created an organizational structure wherein there would be an injustice of unfairness if Defendants are allowed to operate separately, under the control of their holding parent company, without recourse.

## **CLASS ALLEGATIONS**

101.    Plaintiffs, individually and on behalf of the Class, bring this class action against Defendants pursuant to Fed. R. Civ. P. 23, on behalf of:

> **All physicians domiciled in Louisiana who: (a) provided emergency medicine services at current or prior TH Facilities[4], pursuant to Medical Professional Independent Contractor Agreements that contained contract language identical to or similar to the language cited in paragraphs 35 and 36, *i.e.*, that provide bonus credit for physician services and require oversight of APCs but do not explicitly exclude bonus**

---

[4] To be clear, the Class includes all emergency room physicians, who signed similar contracts as the named Plaintiffs that are part of the Team Health Organization in the State of Louisiana, during the applicable statutes of limitations.

**credit for RVUs generated through oversight of APCs; (b) provided assistance and supervision to said APCs, and (c) have not been given bonus credit for those RVUs.[5]**

102.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at the present time, it is estimated that there are hundreds if not thousands of members in the Class.

103.    Despite the numerical size of the Class, the identities of the Class members can be ascertained by Defendants' employment, contract, and accounting records. Plaintiffs and Plaintiffs' counsel do not anticipate any difficulties in the management of this action as a class action.

104.    Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorously prosecute this action and have retained competent counsel experienced in class action litigation. Plaintiffs and Class members have no interests antagonistic to or in conflict with other Class members. Plaintiffs are represented by lawyers who have had extensive experience in

---

[5] Plaintiffs are aware that there are some contracts used by the Defendants that simply state that providers are to be paid through RVU bonus credit for "the services provided by Professional during Company's last billing cycle". These providers are also included in Plaintiffs' Class Definition. At a later date, said providers may function as a subclass if the Court deems necessary but for the purposes of this Class Action Complaint, they are to be included in the Class Definition.

prosecuting class actions and will adequately represent the purported Class in this action.

105.   This action raises numerous questions of law and fact common to the Class members, which predominate over any questions that may affect particular Class Members.  Such common questions of law and fact include:

a. Whether Defendants had a policy or internal guideline against giving bonus credit for RVUs generated by physicians due to supervision of APCs, in whole or in part;

b. Whether Defendants' contracts required Defendants to pay for RVUs generated by physicians due to supervision of APCs;

c. Whether Defendants failed to pay physicians for RVUs generated by physicians due to supervision of APCs;

d. Whether Defendants conduct misled or was likely to mislead physicians that they were not being given bonus credit for RVUs generated by physicians due to supervision of APCs;

e. Whether Defendants committed wire and mail fraud by deceiving physicians into agreeing to work at their facilities that would pay for RVUs generated by physicians due to supervision of APCs but in fact did not intend to;

f.      Whether Defendants' actions were unfair, unconscionable, deceptive, misleading, or likely to mislead physicians like the Plaintiffs;

g.      Whether Defendants engaged in a fraudulent scheme;

h.      Whether Defendants violated 18 U.S.C. § 1962;

i.      Whether Defendants are in bad faith breach of the contracts with Plaintiffs;

j.      Whether or not Plaintiffs and putative class were harmed by Defendants' conduct; and

k.      Whether Defendants had a contractual duty to give bonus credit for RVUs generated by physicians due to supervision of APCs.

106.    The claims or defenses of the represented parties are typical of the claims or defenses of the Class. Plaintiffs have the same interests as the other Class members in prosecuting the claims against Defendants. Plaintiffs and all the members of the Class sustained damages as a result of Defendants' wrongful conduct.

107.    Additionally, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. A

class action is superior to other available methods for the fair and efficient adjudication of this controversy. Common issues predominate. Furthermore, the expense and burden of individual litigation make it extraordinarily difficult for Class members to redress the wrongs done to them individually.

## COUNT ONE

## BREACH OF CONTRACT/BAD FAITH BREACH OF CONTRACT

### (applicable to all Defendants except HCFS)

108.    Plaintiffs re-allege and incorporate the factual allegations as stated in ¶¶ 43 – 100 as pertinent to the allegations contained within this Count.

109.    Plaintiffs and all members of the Class entered into valid contracts with the Defendants, binding on all the parties.

110.    Specifically, Plaintiffs signed agreements with Team Health, LLC and ACS that were broken when all of these Defendants failed to pay the Plaintiffs for RVUs they generated due to supervision of APCs.

111.    AmeriTeam managed the Plaintiffs' contracts after original signature and dictated the RVUs generated by physicians due to supervision of APCs not be paid.

112.   Team Health Holdings, Inc. managed the Plaintiffs' contract after original signature and dictated the RVUs generated by physicians due to supervision of APCs not be paid.

113.   Plaintiffs and all members of the Class performed under the contracts serving patients in the emergency room at TH Facilities for all or part of the preceding six (6) years.

114.   Plaintiffs and all members of the Class earned RVU-based bonuses under the terms of the contracts that Defendants failed to pay.

115.   As a proximate result, Plaintiffs and all members of the Class were damaged.

116.   Defendants' breach of the contracts were in bad faith, entitling Plaintiffs to additional recovery under Louisiana Civil Code article 1997, for all damages, foreseeable or not, including attorneys' fees.

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, demand judgment against Defendants for damages, including legal fees and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Louisiana and the United States of America.

## COUNT TWO

## UNJUST ENRICHMENT

### (applicable to all Defendants)

117.    Plaintiffs re-allege and incorporate the factual allegations as stated in ¶¶ 43 – 100 as pertinent to the allegations contained within this Count.

118.    Defendants wrongfully retained a benefit from Plaintiffs.

119.    It is unjust and inequitable for Defendants to withhold bonus compensation owed to Plaintiffs for the services, supervision, and assistance that they provided.

120.    Specifically, Defendant Team Health Holdings, Inc., Team Health, LLC, ACS, AmeriTeam, and HCFS failed to provide the Plaintiffs and the putative class with payment for RVUs generated by physicians due to supervision of APCs, but retained the benefit of their services.

121.    Defendants knowingly, intentionally, and fraudulently failed to compensate Plaintiffs for the benefit conferred.

122.    As a proximate result, Plaintiffs were damaged.

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, demand judgment against Defendants for disgorgement, legal fees, and costs, in an amount

that would be just and proper under the circumstances and under the laws of the State of Louisiana and the United States of America.

## COUNT THREE

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)
### (applicable to all Defendants)

123.   Plaintiffs re-allege and incorporate the factual allegations as stated in ¶¶ 43 – 100 as pertinent to the allegations contained within this Count.

124.   This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part: (c) it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…

125.   This count is against all of the named who at all relevant times were deemed a "person" within the meaning of 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property".

126.   The activities of the Defendants created an enterprise that is used as a tool to carry out the Scheme and pattern of racketeering activity.  The enterprise is

engaged in and conducts activities that affect interstate commerce.  All named Defendants are associated with the enterprise as they do business collectively as part of the Team Health Organization.

127.   The Defendants are a group of "persons" associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. These Defendants form this association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. Each of the Defendants participated in the operation of or management of the enterprise. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may be other members of the enterprise who are unknown as this time, but which will be uncovered during discovery.

128.   The named Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding the Plaintiffs and putative class.

129.   Specifically, the Defendants conspired and defrauded the Plaintiffs and the putative class by representing and contracting with Plaintiffs to pay physicians for RVUs generated by the physicians due to supervision of APCs in their Team Health contracts, but intentionally and uniformly refusing to do so.

130.   Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of wire and mail fraud, including but not limited to all contracts entered into with Team Health doctors, all RVUs generated by physicians due to supervision of APCs that Team Health received payment for but never paid its doctors for, and all payments made to doctors that were not for the full amount owed, including the RVUs generated by physicians due to supervision of APCs.

131.   The Defendants' routine and systematic refusal to pay for RVUs generated by physicians due to supervision of APCs constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

132.   The racketeering activity, through the use of the interstate mails and wires, was made possible by Defendants' regular and repeated use of the services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

133.   The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

134.   The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous in that they have continued to systematically refuse to pay for RVUs generated by physicians due to supervision of APCs. There was repeated conduct during the past six years, for all named Defendants, and there is a continued threat of repetition of such conduct.  Specifically, the Defendants committed the following recent acts of wire and mail fraud:

     a.    In or around 2014, the Defendants began entering into agreements with Plaintiffs in which they promised to pay for Assisting RVUs.

     b.    From the very beginning, the Defendants intentionally did not pay Plaintiffs for all Assisting RVUs.

     c.    Each month from approximately 2014 through 2018, the Defendants intentionally did not pay Plaintiffs for all Assisting RVUs.

d.     Throughout the entirety of the relationship between Plaintiffs and Defendants, the Defendants, through the Team Health Organization intentionally did not pay Plaintiffs for their Assisting RVUs.

e.     Each time the Defendants received payment for an Assisting RVU and did not credit the supervision for said RVU, they committed mail and wire fraud in violation of the RICO statute because they failed to pay Plaintiffs for the services they provided.

135.   Defendants intentionally caused the Plaintiffs to enter into the agreement to work for the Team Heath facilities, TeamHealth and the Team Health Organization, and never intended to pay Plaintiff for RVUs generated by physicians due to supervision of APCs.

136.   Specifically, Team Health LLC and ACS created and signed the underlying contracts with the Plaintiffs.

137.   AmeriTeam managed the contracts with Plaintiffs.

138.   ACS subcontracted billing functions to HCFS who in turn billed for Plaintiffs' RVUs generated due to supervision of APCs despite not paying the providers like the Plaintiffs for the services billed for.

139.   Team Health Holdings, Inc. ultimately directed the activities of all its agents and subsidiaries, including the decision to not pay the Plaintiffs and the putative class for RVUs generated they due to supervision of APCs.

140.   Team Health Holdings, Inc. created the corporate structure that merely acts as a façade for the enterprise known as Team Health or the Team Health Organization.

141.   Together, all the named Defendants acted in concert to perpetrate these violations against the Plaintiffs and the putative class through the enterprise known as TeamHealth or the Team Health Organization.

142.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and the putative class have been injured in their business and property in that they have not been paid for all services rendered, including RVUs they generated due to supervision of APCs.

**WHEREFORE**, Plaintiffs on behalf of himself and the class they seek to represent, request that the Court enter judgment against the Defendants for actual damages, treble damages, attorney's fees, costs, and any other damages the Court deems just.

## COUNT FOUR

### DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND ACCOUNTING
**(applicable to all Defendants)**

143.   This Count is brought to determine the rights and duties of the Parties under various Medical Professional Independent Contractor Agreements described paragraphs 68-69 above.

144.   A controversy exists between the Parties and putative class members as to Plaintiffs' rights to bonus compensation for assistance and supervision of APCs as described in paragraphs 68-69 above.

145.   Plaintiffs and the putative class seek a Declaratory Judgment by the Court pursuant to 28 U.S.C. §§ 2201-2202 determining the rights of the Plaintiffs and the Putative class, and injunctive relief affording an accounting, restitution, and future payment of all RVUs generated due to supervision of APCs.

**WHEREFORE**, Plaintiffs and the putative class seek a declaratory judgment and Court Order providing an accounting of the RVUs generated by physicians due to supervision of APCs Defendants have not paid, an Order indicating that this is a proper case for declaratory judgment relief, that there is a bona fide controversy among the Parties and, that upon final hearing, the Court declare that Plaintiffs and

putative class members are entitled to bonus compensation for assistance and supervision of APCs, legal fees and costs and such other relief as they are entitled.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the putative class, request that the Court Order the following relief and enter judgment against the Defendants as follows:

A.    An Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel to represent the Class;

B.    A declaration that Defendants have engaged in the illegal conduct described herein;

C.    An Order awarding declaratory and injunctive relief as permitted by law or equity, including permanently enjoining Defendants from continuing their unlawful practices as set forth herein;

D.    A judgment awarding Plaintiffs and the Class actual damages, punitive damages, and restitution;

E.    Ordering Defendants to engage in a corrective marketing campaign to current and future healthcare providers;

F.      Ordering an accounting of the RVUs generated by physicians due to supervision of APCs that Defendants refused to pay Louisiana physicians;

G.      Awarding attorneys' fees and costs incurred in prosecuting this action;

H.      Pre-judgment and post-judgment interest;

I.      All costs of this litigation; and

J.      All other relief that the Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, individually and on behalf of the Class, hereby demands a trial by jury.

Respectfully submitted,

*/s/Andrew A. Lemmon*
Andrew A. Lemmon (#18302)
LEMMON LAW FIRM, LLC
15058 River Road
P.O. Box 904
Hahnville, LA 70057
(985) 783-6789 telephone
(985) 783-1333 facsimile
andrew@lemmonlawfirm.com

*Attorney for Plaintiffs and Plaintiffs' Class*

**OF COUNSEL:**
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
D. G. Pantazis, Jr.
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone:   (205) 314-0557
Facsimile:    (205) 314-0785
Email:          dgpjr@wigginschilds.com

**SERVICE INFORMATION:**
It is anticipated that service will be accepted.